ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: FERRO CORPORATION | ) | **LEAD CASE NO. 1:04CV1440** |
| SECURITIES LITIGATION | ) | Consolidated Case No. 1:04CV1589 |
| | ) | |
| | ) | |
| | ) | Judge John R. Adams |
| | ) | |
| | ) | |
| | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| | ) | |
| | ) | |

## I.  Introduction

This is an action for securities fraud brought on behalf of those who purchased Ferro Corporation securities**.**  The action was filed as a class action and seeks remedies on behalf of those who made purchases during the period of October 28, 2003 through July 22, 2004 (the "Class Period").  Plaintiff's claims are based on violations of Section 10(b) of the Securities and Exchange Act of 1934, Section 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, which was promulgated thereunder.  In short, Plaintiff claims that Ferro's desire to meet market expectations put such pressure on its employees that they were forced to commit securities fraud in order to withstand the pressure.  Furthermore, Plaintiff claims that this was done with the knowledge of Defendants and/or occurred because of their reckless management.

1

Defendants Ferro, Thomas M. Gannon, and Dale G. Kramer, have filed a motion to dismiss Plaintiff's Second Amended Complaint ("the SAC"), which presents the Court with the following issues: (1) whether the alleged false and misleading statements are actionable; (2) whether the complaint fails to plead fraud with particularity; and (3) whether Plaintiff's Section 20(a) claims should be dismissed.  The parties have extensively briefed the matter and the Court has reviewed the pleadings, motion, opposition and reply thereto.  For the reasons that follow, the Court grants Defendants' motion and finds that Plaintiff does not plead scienter as required by both the Private Securities Litigation Reform Act ("PLSRA") and Federal Rule 9(b).  In addition, Plaintiff does not plead fraud with the particularity required by both the PSLRA and Rule 9(b).  Furthermore, without any primary liability, Plaintiff cannot state a claim under Section 20(a) for control person liability.

## II.  Factual Background

For purposes of its consideration of Defendants' motion, the Court must assume the truth of the following facts, which were drawn from the SAC.

### A.    The Parties

City of Pontiac Policemen's and Firemen's Retirement System is the lead plaintiff in this action.[1]  It purchased shares of Ferro stock during the Class Period and represents the class of plaintiffs injured by Defendants' allegedly fraudulent activity.  (SAC ¶ 47).

Ferro is a major international producer of performance materials for industry, which includes coatings and performance chemicals.  Gannon served as Ferro's Vice President and Chief Financial Officer.  Kramer served as Ferro's corporate Vice President of Performance

---

[1] See ECF Docs. 8 & 19 for the Motion for Order to Appoint the City of Pontiac Policemen's and Firemen's Retirement System as Lead Plaintiff  and Court's Order granting same.  Pontiac will be referred to as "Plaintiff" for purposes of the Court's Memorandum Opinion and Order, despite that it represents a potential class.

Chemicals.  Hector Ortino was originally named in this action, but he was later dismissed as a party because he passed away after the litigation commenced.  Ortino was Ferro's Chairman and CEO from 1999 until his death in November 2005.  His alleged actions are relevant as attributable to Ferro.  (SAC ¶ 48-50, 53).

## B.  Substantive Allegations

According to Plaintiff, Defendants instituted a company-wide "culture of fear" at Ferro in order to drive its employees to meet market expectations at any cost.  Plaintiff alleges that Defendants "consciously closed their ears" to information regarding rising raw material prices and Ferro's inability to meet market expectations and they demanded that employees "find a way" to achieve division forecasts that were not realistically achievable.  Furthermore, Plaintiff alleges that when Defendants were given the actual numbers, they rejected them and required employees to make "necessary adjustments" in order to come up with the numbers Defendants wanted.

Employees' jobs were allegedly threatened if they did not make their numbers. According to Plaintiff, this pressure is what drove Polymer Additives division employee Brian Haylor to  "cook the books."  Allegedly, Haylor took the cue to "cook the books" from his superior Tony Maikut, who earlier told him to make an inappropriate journal entry to cover a $330,000 maintenance repair that otherwise would have negatively affected the numbers. Furthermore, the SAC alleges that Haylor made the inappropriate entries "solely because of the pressure put on him to meet the Polymer Additives' forecasts or [else] people would lose their jobs" and that no  one ever challenged the entries, despite that they were "glaring[ly] atypical entries."

Plaintiff claims that Defendants should have known that the entries were falsified, or at the very least they were reckless in not knowing that the results in the Polymer Additives division were being manipulated.  Moreover, Plaintiff claims that Defendants and Ortino issued statements that misrepresented the financial health of the Polymer Additives division.

In July of 2004, Ferro announced an earnings shortfall of more than 70% and slashed its second quarter 2004 earnings estimate.  It also admitted that the Polymer Additives division's performance was overstated as a result of inappropriate accounting entries that were made in that unit.  Ferro also disclosed that it might be required to restate prior periods as a result of the accounting irregularities in the Polymer Additives division.  It was this announcement and subsequent restatement that forms the basis of the SAC.  (SAC ¶¶ 2-3, 11-18, 20-22, 28-33.).

### 1.      Defendants' and Ortino's False Statements

Defendants' and Ortino's allegedly false statements were comprised of various financial reports, press releases, and conference calls.  Specifically, the statements are as follows:

(1)      On October 28, 2003, Ferro issued a conference call and a press release in which it disclosed its financial results for the third quarter of 2003 and incorporated its financial results from the first two quarters of 2003.  Ferro reported revenues of $397 million and a positive cash flow of nearly $41 million.  Ortino commented on the Polymer Additives division, as well as Ferro's overall future prospects, and stated that they had done a "good job" of managing what they could control and doing what was necessary to keep their cost base competitive.  He further stated that they had "continued to improve [their] balance sheet and increase [their] flexibility." Gannon said later, in a conference call with investors, that the company was beginning to

implement price increases in the Polymer Additives division and that it was a profitable business.  (SAC ¶¶ 67-68).

(2)     On November 13, 2003, Ferro filed with the SEC its third quarter 2003 Form 10-Q.  Ortino and Gannon signed the report, which incorporated the previously announced financial results for the third quarter of 2003 and included additional representations stating that the company's disclosure controls and procedures were effective.  (SAC ¶ 69).

(3)     On February 5, 2004, Ferro issued a press release regarding its financial results for the fourth quarter of 2003 and the 2003 fiscal year.  For the fourth quarter, Ferro reported a revenue of $407.4 million and an income of $2.8 million.  For the fiscal year, it reported an income of $17.4 million.  It also reported a positive cash flow from operations of $43 million.  Ortino commented on Ferro's seemingly improved financial performance and stated that the company took "further action in the quarter to improve [its] cost structure and implemented price increases, where appropriate, to help offset higher raw material costs."  Later that day, in a conference call, Ortino commented on several purportedly "positive trends" in the Polymer Additives division and noted that price increases had been successfully implemented to offset some of the margin impact.  He also noted that Ferro was completing significant cost reductions as well as restricting discretionary spending.  During this call, Gannon provided earnings guidance for the first quarter of 2004 and stated that the company expected operating margins to increase and that it was confident that Ferro would deliver strong sales and earnings growth in 2004.  (SAC ¶¶ 72-74).

(4)     On March 12, 2004, Ferro filed with the SEC its 2003 Form 10-K for the fiscal

5

year 2003.  Ortino and Gannon represented that Ferro's performance chemicals segment, including the financial results of the company's Polymer Additives division, had a year-end revenue of $550.6 million and purportedly contributed more than 22% of the total operating income.  The 2003 10-K also indicated that the poorly performing segments of the company had been turned around.  It stated that "price increases were successfully implemented to offset some of the margin impact."  It also stated that significant cost reductions were implemented, discretionary spending had been restricted in the Polymer Additives division, and that further emphasis had been placed on reducing working capital.  (SAC ¶ 75).

(5)     On April 27, 2004, Ferro issued a press release announcing its financial results for the first quarter of 2004.  For this quarter, the company reported a revenue of $451.7 million.  The press release attributed the rise in revenue to "increased product prices" that were implemented throughout the preceding year.  Ortino commented on Ferro's purportedly increasing results and stated that the company "took further action in the first quarter to improve [its] cost structure and implemented price increases and surcharges to help offset higher raw material costs."  Later that same day, in a conference call with analysts and investors, Ortino provided highly positive earnings guidance for Ferro for the remainder of 2004.  He stated that the first quarter had exceeded the company's expectations and that they were very optimistic that they would reach their long-term revenue growth targets.  (SAC ¶ 78-79).

(6)     On May 7, 2004, Ferro filed with the SEC its first quarter 2004 Form 10-Q.  Ortino and Gannon incorporated the company's previously announced financial results and included additional representations concerning the Polymer Additives division, which was

included in its performance chemicals segment results.  Specifically, the Q1 2004 stated that the division had realized an increase in revenue from the previous year and it acknowledged some of the difficulties that the company had with passing along price increases to the market.  (SAC ¶ 80).

According to Plaintiff, Ortino and Gannon knowingly certified the false and misleading results for the year-ended 2003 and for the first quarter of 2004 because they stated that the financial statements and other information included in the reports was fairly presented in all material respects.  They also stated that the reports did not contain any untrue statements of fact or omit to state any material facts.  In addition, Ortino and Gannon stated that Ferro had established and maintained disclosure controls and procedures that were sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized and reported within the specified time periods.  (SAC ¶¶ 137-38).

### 2.     The Restatement

On July 23, 2004, Defendants and Ortino announced an earnings shortfall for the second quarter of 2004 that was more than 70% and they reported that Ferro was revising its earnings for that quarter.  The press release stated, in pertinent part, that the shortfall was largely the result of poor performance by the Polymer Additives business, which fell short of the company's expectations.  The price of Ferro common shares fell immediately. (SAC ¶¶ 83-84).

On September 14, 2004, Ferro announced that it had completed its investigation and claimed that all of the irregular entries were made by a subordinate employee – Haylor – who had since left Ferro.  It stated that its total non-cash charge to earnings was slightly less than previously disclosed and admitted that, due the accounting irregularities in the Polymer

Additives division, some of its previously reported financial results were false and would need to be restated.  (SAC ¶ 88).

On January 18, 2005, Ferro issued another press release to update investors on the results of the investigation and on the upcoming restatement.  The press release stated that the company had substantially completed its review of financial statements for the periods covered by the investigation and that it intended to adjust its financial statements for the errors discovered in the books of the Polymer Additives business.  It also announced that the total of the prior-period adjustments increased to approximately $10 million versus the prior estimate of $6.4 million.  The company also disclosed that KPMG, its external auditors, requested that additional investigative procedures be performed.  Ferro claimed that the investigators performed the additional procedures and that their original conclusions showed that all of the potentially irregular accounting errors had been made in the Polymer Additives division and were made without the knowledge of or involvement of senior management.  KPMG requested additional investigation, which Ferro stated was currently in progress.  Ferro also stated that there was investigation into whether there were other irregular accounting entries in another smaller business unit.  Ultimately, Ferro decided to restate for the year-ended 2003 and for the first quarter of 2004, and it disclosed its estimated restated financial results.  (SAC ¶¶ 89-92).

On April 21, 2005, Ferro released an update on its internal investigation.  It admitted that the investigation revealed "isolated instances" of what could be considered as discussions of possible inappropriate accounting.  It also admitted that the investigation team "identified some transactions that may have included errors in the timing of income or expense recognition and some entries for which the team could not identify sufficient documentary evidence to determine

8

whether proper accounting treatment was applied."  It further stated that KPMG had been unable to conclude that the investigation was adequate and that it believed further investigation by a new investigation team was warranted.  (SAC ¶¶ 97-98).

On October 31, 2005, Ferro announced the results of the new independent investigation and noted that it did not result in a finding that the accounting improprieties were accomplished without any knowledge or involvement of senior management.  Ferro admitted that the investigations found "evidence of Ferro accounting personnel spreading expenses and some other misapplications of generally accepted accounting principles ("GAAP") to achieve internal forecasts."  The company also stated that the investigations revealed "a lax tone with respect to GAAP compliance" among certain members of Ferro's finance organization.  In addition, Ferro revealed that the investigators found a "pattern or practice of engaging in fraudulent earnings management . . . in a way that misleads the investing public."  The company maintained, however, that this pattern was not "pervasive."   (SAC ¶ 99**).**

On March 31, 2006, Ferro restated its earnings ("the Restatement").  According to Plaintiff, the Restatement serves as an admission that: (1) the financial results originally issued during the Class Period and Ferro's public statement regarding the results were materially false and misleading; (2) the financial statements reported during the Class Period were incorrect based on information available to Defendants and Ortino at the time the results were originally reported; and (3) the financial statements could no longer be relied upon as being accurate. (SAC ¶ 108).

Specifically, Ferro admitted the following in the Restatement: (1) its reported net income for the first quarter of 2003 was overstated by $2.3 million and its earnings for that quarter were

overstated by 37.5%; (2) its reported net income for the second quarter of 2003 was overstated by $4.0 million and its earnings for that quarter were overstated by $333.3%; (3) its reported net income for the fourth quarter of 2003 was overstated by $1.7 million and its earnings for that quarter were overstated by 500%; (4) its reported net income for fiscal 2003 was overstated by $7.7 million and its reported earnings for the year were overstated by 111.1%; and (5) its reported net income for the first quarter of 2004 was overstated by $5.4 million and its earnings for that quarter were overstated by 50%.  In total, Ferro's pre-tax income from continuing operations was overstated by $9.4 million for 2003 and $1.5 million for the first quarter of 2004. (SAC ¶ 34, 117).

### 3.    Allegations of Accounting Improprieties

According to Plaintiff, in order to artificially inflate Ferro's stock price, Defendants and Ortino falsely reported Ferro's financial results during the Class Period through the use of improper revenue recognition, not recording liabilities and expenses, not recognizing inventory cost increases in its cost of sales, and not reconciling accounts, thereby materially overstating the company's net income, earnings per share and financial position.  Plaintiff alleges that Defendants and Ortino, as a means to their end, engaged in a deliberate scheme of fraudulent accounting practices and financial reporting that did not comply with either GAAP or SEC rules. This, according to Plaintiff, resulted in material errors and irregularities in Ferro's financial statements and public announcements that were issued prior to and during the Class Period. Plaintiff also alleges that this "bogus accounting" and financial reporting was not only limited to Ferro's Polymer Additives division, but that it was rampant throughout the entire company. (SAC ¶ 101, 107, 116).

10

### 4.      Lack of Internal Controls

Plaintiff alleges that Defendants and Ortino were able to defraud Ferro shareholders and inflate the price of the company's stock through accounting improprieties, which resulted in materially misstated financial statements by means of circumventing and failing to establish and maintain adequate internal accounting controls.  According to Plaintiff, Ferro: (1) had insufficient accounting policies and procedures; (2) had inadequately trained and an insufficient numbers of accounting personnel; (3) failed to adhere to policies and procedures associated with the financial statement reporting process; (4) failed to consistently reconcile and perform timely reviews of accounting reconciliations, data files, and journal entries; (5) failed to properly identify and ensure receipt of agreements for review by accounting personnel; and (6) failed to consistently review the calculations and accounting for amounts due to employees under various compensation plans.  (SAC ¶ 142).

In support of its position, Plaintiff points to KPMG's audit of management's assessment of internal controls, which summarized Ferro's internal control failures as a material weakness. It defined this as a "control deficiency, or combination of control deficiencies, that result[ed] in more than a remote likelihood that a material misstatement of the annual financial statements [would] not be prevented or detected."  Specifically, KPMG's opinion on the ineffective operation of internal controls  over financial reporting noted, in pertinent part, the following: (1) Ferro's accounting policies and procedures were insufficient; (2) certain policies and procedures were not consistently followed; (3) there were deficiencies in several accounting areas, which resulted in errors in inventory, accrued liabilities, accounts payable and receivable, inter-company accounts, and related income statement accounts; (4) Ferro did not have appropriate

11

controls in place to ensure that agreements with financial reporting implications were received by accounting personnel to review; and (5) certain business units had insufficient controls to ensure that amounts recorded under incentive compensation programs were properly calculated. (SAC ¶¶ 147-48).

## C.    Scienter Allegations

According to Plaintiff, Defendants acted with scienter because: (1) they knew that the public documents and statements Ferro issued or disseminated were materially false and misleading; (2) they knew that such statements or documents would be issued or disseminated to the investing public; and (3) they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.  (SAC ¶ 150).

### 1.   Defendants' Attempts to Hush Witnesses

Plaintiff alleges that Defendants created a scheme to hide their fraudulent activities by entering into "silence agreements" with former employees whereby the former employees would receive large severance payments (sometimes up to four months of salary) if they agreed to sign an agreement in which they would not talk about Ferro for an extended period of time. These agreements, Plaintiff claims, were not in existence prior to 2002. (SAC ¶ 151).

### 2.   Ferro's Creation of a "Culture of Fear" and Fixation on Stock Price

Plaintiff, through reference to certain "confidential witnesses," alleges that Defendants were obsessed with the price of Ferro stock and that this obsession regarding the stock price caused them to institute what Plaintiff deems a "culture of fear" at Ferro.  This "culture of fear" was allegedly designed to ensure that Ferro met market expectations.  Plaintiff claims that Ferro management "lived and died" by the stock price.  According to Plaintiff, Defendants allegedly

knew or were reckless in disregarding the inappropriate accounting entries that caused Ferro's financial reports to be false.  Plaintiff directly attributes Defendants' alleged wrongdoing to the fact that they instituted this "culture of fear" at Ferro.  Specifically, Plaintiff alleges that Ortino was "only interested in stock price" and that he did not care if employees could not make their numbers.  He is referred to as an assassin who put "ungodly" pressure on his employees. Furthermore, Plaintiff alleges that it was this pressure that could have led to somebody "cooking the books."  (SAC ¶¶ 152-62).

### 3.  Defendants' Micro-Management of Ferro

Plaintiff alleges that Defendants knew about the accounting problems at Ferro because Defendants micro-managed the company and kept themselves well-informed of its financial affairs.  Defendants allegedly received monthly reports regarding Ferro's operations and finances that explained any "gaps" in the numbers.  Defendants also allegedly attended monthly financial presentations on the Polymer Additives unit and bi-monthly "Forecast Meetings" to discuss the division's forecast.  One of the confidential witnesses could not understand how the accounting errors could not have been caught because reports were prepared every two weeks.

The SAC further alleges that Ferro "blamed" subordinate employee Haylor for the accounting irregularities in the Polymer Additives division.  One confidential witness referred to Haylor as a "nice guy" who was "absolutely incapable of conducting an accounting fraud on his own."  This same witness stated that it was "utterly laughable" to think that Haylor could come up with a fraudulent accounting scheme on his own.  According to the allegations contained in the SAC, Haylor's responsibility was merely "collecting numbers" and not "identifying them."

In essence, the SAC alleges that Defendants "hammered" certain employees about

13

the company's numbers and that the numbers were fed to Haylor by Kramer and other employees who were above him.   It further alleges that Defendants "must have known" about the numbers because it was not possible that a subordinate accountant could have "cooked the books" without Defendants' knowledge.  According to the SAC, "[n]o one at Ferro could have made those errors without notice – unless it was done with the knowledge of the people at the very top."  Moreover, the SAC alleges that it was not possible for Ortino not to know about the problems with the numbers because he was an "absolute micro-manager." (SAC ¶¶ 163-172).

### 4.  Ferro's Financial Troubles

By the beginning of the Class Period, Ferro was allegedly so cash-strapped that it refused to pay its suppliers.  This resulted in the company's alleged inability to find suppliers who would supply the raw materials it needed to fill the orders that Ferro already had.  As a result, the company's credit was allegedly cut off with many of its raw material suppliers and it was forced to keep switching suppliers in order to find one who could fill the orders for raw materials.  Plaintiff claims the  company would do "whatever it could do not to pay bills."

In addition to being strapped for cash, the cost of raw materials escalated and Ferro was unable to pass the raw material price increases on to its customers because it was worried that the customers would switch.  During this time period, Ferro was also losing contracts to its competitors.  This allegedly added to Ferro's failure to raise its prices to off-set the rising raw material prices because the company could not afford to lose any more customers.  Plaintiff claims that even though Ferro was cutting inventory, not paying suppliers, and terminating its employees, it was also making product in anticipation of orders that did not materialize, which left it with already-made product that it could not sell.  (SAC ¶ 173-185).

### 5.  The Failure of the Polymer Additives Division

According to the allegations contained in the SAC, the Polymer Additives division ceased being profitable around 2002 to early 2003.  Plaintiff further alleges that Kramer was aware that it was not a profitable division at the time he made his statements to the contrary. Around this time, Kramer allegedly attended a meeting in which he acknowledged the numbers showed that the Polymer Additives division was failing.  (SAC ¶¶ 186-187).

### 6.  Insider Stock Sales

According to the allegations contained in the SAC, while Defendants were hiding the truth about Ferro's financial results and prospects from the investing public, Ortino sold or otherwise disposed of his personally-held shares of Ferro common stock and profited over $2.16 million.  The SAC also sets forth Defendants' and Ortino's salary, bonuses, and other compensation for the fiscal year 2003.  (SAC ¶¶ 188-190).

## III.  Applicable Pleading Standards

### A.      Rule 12(b)(6)

In ruling upon the typical Rule 12(b)(6) motion to dismiss, the Court "must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) (citing *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993)).  If an allegation is capable of more than one inference, the Court must construe it in the plaintiff's favor.  *Id.*  The Court may not grant a Rule 12(b)(6) motion merely because it may not believe a plaintiff's factual allegations.  *Id.*  Although this is a liberal standard of review, the plaintiff still

must do more than merely assert bare legal conclusions. *Id.* To survive a Rule 12(b)(6) motion to dismiss, the plaintiff's complaint must allege either "direct or inferential" allegations regarding all of the material elements necessary to sustain recovery under "some" viable legal theory. *Id.*

## B.     Pleading Securities Fraud

Because this is a securities action, however, the Court is required to apply an even more vigorous standard of review. It must first view the allegations under Federal Rule 9(b)'s requirement that claims of fraud be plead with particularity. Fed. R. Civ. P. 9(b). Specifically, this rule states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Id.* In order to satisfy this heightened requirement, a plaintiff must detail specifically the facts and circumstances it claims constitute the defendant's fraudulent conduct. *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999) (quotation omitted). In other words, the plaintiff must "allege the time, place, and content of the alleged misrepresentation," the fraudulent intent of the defendants, and the resulting injury. *Id.* (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993)). Generalized and conclusory allegations that the defendant's conduct was fraudulent do not satisfy Rule 9(b). *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) (citation omitted).

Notwithstanding Rule 9(b)'s mandate that fraud must be plead with particularity, the Court must also apply the strictures of the PSLRA, which requires that a plaintiff state with particularity all facts supporting an allegation made on information and belief, as well as all facts

16

that establish scienter.  Section 78u-4(b) states, in relevant part, the following:

**(b) Requirements for securities fraud actions**

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant - -

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b) (1)-(2).

Thus, Plaintiff must set forth specific facts not only in support of allegations of falsity and fraud, but also to support allegations of the requisite state of mind.  In other words, Plaintiff must plead *facts* giving rise to a strong inference of scienter – complaints containing conclusory allegations are properly dismissed.  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 551 (6th Cir. 2001).  As with a typical 12(b)(6) motion, the Court is still required to draw inferences in favor of the plaintiff; however, the Court is required to accept plaintiff's inferences of scienter only if those inferences are the most plausible of competing inferences.  *Id.* at 553.

17

## IV.  Discussion

Section 10(b) of the Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Under Rule 10b-5, it is illegal for one "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ."  17 C.F.R. § 240.10b-5.

To establish a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege – in connection with the purchase or sale of securities – the following: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) justifiably relied on by the plaintiff; and (5) proximately causing their injury.  *See e.g.*, *Helwig,* 251 F.3d at 554 (citing *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir. 1991)).  Control person liability under Section 20(a) is contingent upon the plaintiff's ability to prove a primary violation under Section 10(b).  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir. 2004).  Dismissal of the control person claims is appropriate when the plaintiff does not establish the primary violation alleged.  *Id.*

## A.      The SAC Fails To Pleads Scienter With Particularity

The Court will first address the scienter element of Plaintiff's claims under Section 10(b) and Rule 10b-5.  To do so, the Court must engage in a fact-intensive analysis based on the totality of the circumstances.  *In re FirstEnergy Corp. Sec. Litig.*, 316 F.Supp.2d 581, 597 (N.D.

18

Ohio 2004)(citation omitted).   In securities fraud claims based on statements of present or historical fact, such as Plaintiff's claims in this case, scienter can be established by knowledge or recklessness.  *PR Diamonds, Inc.*, 364 F.3d at 682.  To the extent that Plaintiff alleges forward-looking statements, the PSLRA applies a different scienter requirement pursuant to its "safe harbor" provision.  *Id.* at 681 n. 3. "Forward-looking statements include projections and estimates of a company's future economic performance, including statements related to revenues, earnings per share, income, dividends, capital expenditures, capital structure, and other financial items."  *Id.* (citing 15 U.S.C. § 78u-5(i)(1)).  With respect to forward-looking statements, state of mind is irrelevant if the statements are accompanied by meaningful cautionary language; otherwise, the required state of mind is actual knowledge.  *Id.* (citing 15 U.S.C. § 78u-5(c)(1)(A)(B)).

In its Opposition, Plaintiff (conceding that knowledge of the false statements was not adequately pleaded) argues that it has adequately alleged that Defendants were "at least" reckless.  In securities fraud cases, recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care."  *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999) (quoting *Mansbach v. Prescott, Ball & Turben*, 592 F.2d 1017, 1025 (6th Cir. 1979)).   Recklessness under the PSLRA is "a mental state apart from negligence and akin to conscious disregard."  *Id.*  "While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it."  *Id.* (quotation omitted).  Thus, the issue is whether Plaintiff has alleged facts sufficient to give rise to a strong inference that, when Defendants made the alleged misrepresentations or materially misleading omissions, they did so with at least a conscious disregard of the falsity of that information.

19

As the Court has previously indicated, Plaintiff is not entitled to all inferences of scienter in their pleading.  Rather, the allegations of scienter will only survive Defendants' motion if those inferences are both reasonable and strong.  The Court must balance competing interests and credit Plaintiff's inferences only if it appears from all the facts and circumstances that those are the most plausible. *PR Diamonds, Inc.*, 364 F.3d at 683-84.  Again, it is not enough for Plaintiff to show that Defendants were negligent – there must be sufficient allegations of *knowing* or *reckless* conduct.  And, having applied this standard, the Court finds that Plaintiff's SAC is insufficient because it fails to properly plead scienter in accordance with the PSLRA.  As the Sixth Circuit has noted, "recklessness in securities fraud cases is an untidy case-by-case concept."  *Helwig*, 251 F3d at 551 (citation omitted).   The Court has considered all of Plaintiff's allegations individually and then looked at the totality of the circumstances.  Having done that, the Court concludes that no strong inference exists.  *PR Diamonds*, 364 F.3d at 684 ("Accordingly, we sift through Plaintiff's allegations individually and then aggregate the nuggets of inference they generate, concluding in the end no strong inference arises").

1.    **The Confidential Witness Allegations Do No Satisfy the PSLRA's Strict Pleading Requirements**

According to Defendants, the allegations by certain confidential witnesses do not satisfy the PSLRA's strict pleading requirements because: (1) numerous confidential witnesses left before the start of the Class Period; (2) the descriptions of the confidential witnesses are vague; and (3) the SAC is lacking in factual particulars that any confidential witness had knowledge regarding exactly what information was known by each individual Defendant.  Defendants also point out that Plaintiff's "culture of fear" theme is an irrelevant smokescreen that is being used to compensate for the gaping holes in its implausible securities fraud theory.

20

Plaintiff, on the other hand, argues that the confidential witnesses' statements amount to more than mere "water-cooler gossip," "irrelevant speculation," and "gratuitous criticism" of Ferro and the Individual Defendants. It argues that the witnesses' statements are "personal observations" and that the statements are corroborated by one another. In essence, Plaintiff attempts to persuade the Court that the sheer number of confidential sources overcomes the weaknesses in the statements themselves. However, "a shared opinion among confidential witnesses does not necessarily indicate either the falsity or a strong inference of scienter if the allegations themselves are not specific enough." *In re Metawave Communications Corp.*, 298 F.Supp.2d 1056, 1070 (W.D. Wash. 2003) (citation omitted). Moreover, "a shared opinion does not necessarily indicate either the falsity of or a strong inference of scienter if the allegations themselves are based on hearsay, rumor or speculation." *Zucco Partners, LLC v. Digimarc Corp.*, 445 F.Supp.2d 1201, 1208 (D. Oregon 2006).

In this case, most of the statements from the confidential witnesses do not appear to be based on personal knowledge. Rather, as Defendants note, they do amount to "water-cooler gossip," "irrelevant speculation," and "gratuitous criticism." Importantly, a majority of the statements from the confidential witnesses speak only to the alleged "culture of fear" at Ferro or to Ortino's intense, number-driven style of management (SAC ¶¶ 152, 154, 155-63, 165, 170, 172) and a vast number of the statements, which attempt to show Defendants and Ortino's knowledge of the alleged fraud, amount to nothing more than mere speculation. (SAC ¶¶ 155, 163-164, 166-72).

The Court concludes, therefore, that the Confidential Witness statements, examined either separately or as a group, do not create a strong inference of scienter. In order for the

statements to evidence scienter, "[t]he Court must be able to tell whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo." *In re Metawave*, 298 F.Supp.2d at 1068. Here, numerous statements amount to no more than blatant speculation regarding what Defendants and Ortino should have/could have/would have known regarding the alleged fraud. (SAC ¶¶ 155, 161, 164, 166-68). These types of conclusory "he-must-have-known" allegations are routinely rejected by courts as not evidencing scienter. *PR Diamonds,* 364 F.3d at 694 (finding that the court would be remiss to infer scienter based on the conclusory allegations that the defendant "must have known" of the alleged fraud); *see also Zucco Partners, LLC*, 445 F.Supp.2d at 1208 (finding a confidential witness's statements did not demonstrate scienter because there was no evidence that the confidential witness did not identify the basis of his knowledge and the allegations were conclusory) (citation omitted). Accordingly, the Court finds that the confidential witness statements do not evidence scienter.[1] They neither demonstrate actual knowledge, nor recklessness under the PSLRA.

2.     **The Information Supplied By Haylor Does Not Support a Strong Inference of Scienter**

The Court agrees with Defendants that the information allegedly supplied by Haylor also does not support a strong inference of scienter. As previously stated, Plaintiff must plead facts giving rise to a strong inference of scienter – conclusory allegations do not suffice. *Helwig,* 251 F.3d at 551. The Court must draw inferences in Plaintiff's favor, but it is required to accept those inferences of scienter only if they are the most plausible of competing inferences. *Id.* at 553. In this case, the Haylor allegations fail to demonstrate scienter because they do not meet

---

[1] Because Defendants' briefing illustrates adequately the problems associated with the particular confidential witness statements, the Court need not exhaustively detail those problems herein.

the PSLRA's stringent pleading requirements.  Not only are the allegations grossly conclusory, the plausible inference to which they lead is that Haylor committed fraud because he was under pressure to meet his numbers.  That Defendants and Ortino put pressure on Ferro employees does not lead to an automatic finding of scienter.  Likewise, while extreme pressure to make numbers may cause an employee, such as Haylor, to commit fraud, the mere exertion of pressure by management is not fraud.   Although Plaintiff has adequately plead that Haylor committed fraud, and that he was arguably driven to do so by Defendants and Ortino, Plaintiff has failed to sufficiently plead that Defendants or Ortino had knowledge of this fraud or that they were reckless in not discovering it.  *Cf. Fener v. Belo Corp.*, 425 F.Supp.2d 788, 815 (N.D. Tex. 2006) (finding allegations that the defendant's programs, which were adopted to motivate employees and increase circulation, were subject to abuse and fraud by employees, but that the plaintiffs failed to sufficiently attribute knowledge of abuse of the system to the defendants).  Moreover, even if Ferro's "practices and methods [created] a risk or even a probability of abuse, mismanagement alone is not enough to constitute securities fraud."  *Id.* at 815-16.

The Court agrees with Defendants, after examining the allegations in the SAC, that the Haylor allegations fall short of what is required by the PSLRA.  Plaintiff does not pleads facts showing that Defendants knew about, acted recklessly, and/or were irresponsible for the inappropriate accounting entries.  Rather, Plaintiff pleads repeatedly that Haylor – not Defendants or Ortino – was aware of and responsible for the inappropriate accounting entries. "One distinguishing characteristic of a strong showing of scienter is that it highlights a mental state embracing a strong intent to deceive, manipulate, or defraud, and serves to separate optimistic statements and/or negligent acts from fraudulent ones."  *In re Remec Inc. Securities*

*Litig.*, 415 F.Supp.2d 1106, 1118 (S.D. Cal. 2006).  In this case, Plaintiff fails to point out exactly what Defendants and Ortino did that is indicative of scienter.  Other than focusing on the intense management style at Ferro, Plaintiff does not plead facts evidencing that Defendants or Ortino had a mental state that embraced an intent to deceive, manipulate, or defraud.  And while the allegations may "move down the scienter path, they fail to distinguish what is non-actionable bullish conduct from fraudulent or reckless conduct."  *Id.*  This, coupled with the overall conclusory nature of the allegations, is what prevents this Court from finding that the Haylor allegations demonstrate scienter.

### 3.    *Helwig* Factors

In *Helwig*, the Sixth Circuit provided guidance as to how much scienter is enough and what allegations satisfy the requirement of a "strong inference."[1] According to Defendants, only two of the *Helwig* factors are relevant – the alleged self-interested motivation of the Defendants and the alleged insider trading.  Plaintiffs, on the other hand, argue that at least six of the nine *Helwig* factors are present in the SAC.  The Court, however, disagrees with Plaintiffs that six of the nine factors are present.  And while the Court recognizes that the *Helwig* factors are non-exhaustive, *Fidel v. Farley*, 392 F.3d 220, 233 (6th Cir. 2004), the absence of these factors indicates the absence of scienter.  Nevertheless, despite the Court's view that these

---

[1] These factors are as follows: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission, and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) the existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) the disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of the defendants in the form of saving their salaries or jobs.  *Helwig*, 251 F.3d at 552 (citation omitted).

factors are not present, it will examine each of the factors that Plaintiff has raised in turn.

      **a.**     **Insider trading**

According to Plaintiff, there is evidence of insider trading because Ortino sold 82,585 shares of Ferro common stock during the Class Period (specifically from December 15, 2003 through June 17, 2004) for a total value of $2.16 million.  The Sixth Circuit has held that insider sales at "unusual or suspicious" levels is probative of motive.  *Comshare*, 183 F.3d at 553 (citation omitted).  In other words, courts "consider a plaintiff's allegations that the individual defendants engaged in insider trading to be a motive to commit fraud.  By trading on inside information, executives stand to profit from what may turn out to be other shareholders' losses." *In re Cardinal Health Inc. Sec. Lit*ig., 426 F.Supp.2d 688, 727 (S.D. Ohio 2006).  Here, Plaintiff tries to argue that Ortino's sale of stock (none of the Individual Defendants sold stock during this period) is indicative of motive because he traded on insider information to make a profit.

The only thing even arguably "suspicious" about the sale of his stock, however, is that it was sold during the class period.  Plaintiff pleads no other facts that are probative of motive. It is not enough to merely plead insider trading "without regard to either context or the strength of the inferences to be drawn . . . . At a minimum, the trading must be in a context where defendants have incentives to withhold material non-public information, and it must be unusual, well-beyond the normal patterns of trading by those defendants." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999) (citations omitted).  The mere sale of stock is not enough to lead the Court to infer scienter.  *See generally In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) (finding no inference of scienter where three of the five individual defendants sold no stock during the class period and those who did sold only a small percentage of their stock).

Furthermore, although there is no "bright line" test to determine whether a defendant's sale of his or her stock is "suspicious," courts routinely analyze the sale of stock by applying the following three factors: (1) whether the alleged trades were "normal or routine" for that particular insider; (2) whether the profits reaped were substantial enough in relation to the insider's compensation level so as to produce a suspicion that the insider might have had an incentive to commit fraud; and (3) whether in light of the insider's total stock holdings, the sales were unusual or suspicious.  *Cardinal Health*, 426 F.Supp.2d at 728 (citing *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 644 (E.D. Va. 2000)).

With respect to the first factor, the Court cannot conduct a meaningful analysis because the SAC is devoid of any circumstances surrounding Ortino's sales of Ferro stock and of his historical trading prices.   In other words, the Court has no idea whether the alleged trades were "normal or routine" for Ortino.

With respect to the second factor, the SAC alleges that Ortino's total compensation for 2003 was $3,057,373 and that his total compensation for 2004 was $2,843,763.  However, the Court has no more information than this and is unable to give any context to these numbers. Without any information regarding Ortino's past practices, the Court is unable to fully understand the relationship the alleged insider trading had on Ortino's compensation structure. The Court does not know if the $2,161,160 that Ortino made from the sale of stock during the class period was out of line and excessive, or whether this amount was typical and routine. Accordingly, this pleading deficiency prevents the Court from truly assessing whether Ortino's sales were unusual.  *Greebel*, 194 F.3d at 198.

With respect to the third factor, the Court can do somewhat of a more meaningful

26

analysis because Defendants provide some of the numbers necessary to give an appropriate context.  For instance,  Defendants point out that, as of March 5, 2004, Ortino owned and/or had the right to more than 740,000 shares of Ferro common stock.  They also note that Ortino sold only a small fraction of his exercisable holdings (11.0%) and that the overall value of his holdings dropped approximately $3,000,000 after the July 23, 2004 announcement.  Defendants argue that the sale of such a small percentage of holdings refutes any inference of scienter and the Court agrees.  The fact that Ortino sold only 11.0% of his exercisable holdings does not demonstrate scienter.

Plaintiff urges the Court to find otherwise by pointing it to *In re MTC Elec. Techs. S'holders Litig.*, 898 F.Supp. 874, 980 n.4 (E.D.N.Y. 1995), where the court – without analyzing the factors listed above – concludes in a footnote that the sale of 8,333 shares of stock for $173,993 raised a strong inference of scienter.  In a similar vein, Plaintiff directs this Court to find scienter based on *Schlagal v. Learning Tree Int'l*, No. CV98-6384 ABC(Ex), 1998 U.S. Dist. LEXIS 20306, at 49 (C.D. Cal. Dec. 29, 1998).  In *Schlagal*, the court found it probative of scienter that the defendants sold 318,918 shares of stock for a profit of $10.6 million.  It noted that although some "courts often require Plaintiffs to allege that the insider trading activity was 'unusual' in order to constitute motive, courts have also found that the amount of stock sales as either a percentage or dollar amount may itself be unusual enough to support a scienter allegation."  *Id.* (citation omitted).   Notwithstanding that the amount of money at issue in *Schlagal* was considerably higher than the amount in this case and the fact that more than one defendant sold stock, this Court does find it necessary to consider whether the sale was at unusual or suspicious levels, as that is the standard employed in this circuit.  *Comshare*, 183 F.3d

27

at 553.  In addition, that none of the Individual Defendants sold stock during this period weighs against a finding of scienter.  *See San Leandro Emerg. Med. Group Profit Sharing Plan v. Phillip Morris Co., Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) ("In the context of this case. . . the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive); *but see In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F.Supp.2d 527, 542 (S.D. Ohio 2000) (finding a strong inference of scienter where the plaintiffs "made numerous specific allegations that a number of officers and directors sold a large portion of SmarTalk stock, constituting a large portion of their holdings, in close temporal proximity to the false statements in question).  Accordingly, the Court declines to find Ortino's sale of stock probative of motive.

### b. Divergence Between Internal Reports and External Statements

Plaintiff next argues that there was divergence between internal reports and external statements on the same subject.  According to Plaintiff, this factor is satisfied because Defendants and Ortino were in possession of specific knowledge about the Polymer Additives division when they made contradictory statements to the market.  Plaintiff, however, gives the Court nothing concrete on which to make a finding that there was a divergence between internal reports and external statements on the same subject.  Although the SAC refers repeatedly to certain "Monthly Reports, " it is unclear exactly what was in the reports, exactly what statements were made on the same subject, and how the information in the external statements was different from the information in the internal reports.

The SAC alleges that the Individual Defendants and Ortino would receive forecasts from

28

the Polymer Additives division and then turn around and reject the forecasts as not coming close enough to the market's expectations.  They would then dictate a higher forecast that allegedly had no basis in reality, which would require the Polymer Additives division to make necessary adjustments to the forecast in order to come up with the numbers given to it by the Individual Defendants and Ortino.  (SAC ¶ 11-12).  These Monthly Reports also purportedly included separate sections on operations and finances, with each respective section reflecting on differences between the months and explaining any gaps. (SAC ¶ 163).  The mere reference to certain internal reports, however, is not enough for the Court to find that what was in these internal reports conflicted with external reports on the same subject.  This is because Plaintiff's allegations do not clearly show a divergence between Ferro's internal reports and external statements and, as a result, do not satisfy the PSLRA's pleading requirements with respect to specificity.  *See PR Diamonds, Inc.*, 364 F.3d at 692 (finding "no *specific* allegations of a divergence between internal reports and external statements on the same subject.") (emphasis added).

     **c.**    **Closeness in Time of an Allegedly Fraudulent Statement or Omission and the Later Disclosure of Inconsistent Information**

Plaintiff argues that this factor is present because there is closeness in time between an allegedly fraudulent statement and a later disclosure.  Specifically, Plaintiff points to the May 7, 2004 Form 10-Q ( which included both earnings and income that were overstated) and the April 27, 2004 press release (which made statements to securities analysts regarding Ferro's ability to raise prices to offset rising raw material costs and the company's growth).  Plaintiff alleges these false statements, coupled with Ferro's decision to restate its earnings approximately three months later, is evidence of scienter.  Defendants, on the other hand, argue that the press release

specifically pointed out that the Polymer Additives division was having problems and that it was consistent in that respect to the company's July 23, 2004 announcement.  The Court agrees that to some extent the information is consistent, which would make this factor weigh against a finding of scienter.  But, even assuming the later disclosure was totally inconsistent and that the three months time period was close enough in temporal proximity to weigh in favor of a finding of scienter, this is just one factor out of many that the Court must analyze.  *FirstEnergy,* 316 F.Supp.2d at 597 (noting that the court must analyze the totality of the circumstances in securities fraud cases).

> **d.** **Evidence of Bribery by a Top Company Official**

Plaintiff concedes that there is no evidence of typical bribery, but points to the alleged "silence agreements" and argues that this factor is present.  According to Plaintiff, in order to prevent former employees from coming forward with information about the fraud, Defendants and Ortino sent former employees "reminders" of the agreement they signed and that this was done to keep the former employees from talking about what was going on during the Class Period.  Defendant, however, argues that these "silence agreements" amount to nothing more than routine confidentiality agreements.  Furthermore, Defendants argue, Plaintiff has not alleged a single fact that Defendants or Ortino ever tried to actually "bribe" a former employee against talking about the accounting irregularities.  The Court agrees with Defendants and does not find that this factor is present.

> **e.** **Disregard of Current Factual Information Before Making Statements**

Plaintiff argues that Defendants blatantly disregarded the problems in the Polymer Additives division when they made statements to the investing public that the division was

adequately making up for the rising raw material prices through increased prices to customers and through cost-cutting.  Defendants, on the other hand, argue that Plaintiff does not allege that Defendants or Ortino disregarded any then-current factual information in making public statement and the Court agrees.  *See PR Diamonds, Inc.*, 364 F.3d at 693 (finding that the sixth *Helwig* factor was not present because the plaintiffs' allegations lacked specific facts such as when the defendants became aware of the accounting improprieties).

  **f. Self-Interested Motivation of Defendants**

  Plaintiff argues that the self-interested motivation of Defendants to protect their salaries, bonuses, and other compensation evidences scienter.  However, the SAC doe not allege facts sufficient to support a showing that any of the Defendants were motived to commit fraud in order to save their salaries or jobs.

  **4. The Nature and Magnitude of Accounting Improprieties and GAAP Violations Does not Support a Finding of Scienter**

  Plaintiff next argues that the nature and magnitude of the accounting improprieties and the GAAP violations support an inference of scienter.  Plaintiff concedes that GAAP violations "standing alone" are not enough to support scienter, but argues that they can be when viewed in combination with other allegations.  In support of its position, Plaintiff cites to *FirstEnergy*, 316 F.Supp.2d at 598, where the Court found that a GAAP violation in combination with the existence of other *Helwig* factors supported a strong inference of scienter.  However, as the Court has previously stated, none of the *Helwig* factors are present here.  Thus, *FirstEnergy* is inapplicable to the facts of this case.

  Plaintiff also claims that it has alleged many "red flags" that Defendants and Ortino "deliberately ignored."   The Court, however, agrees with Defendants (for the reasons stated

previously) that Plaintiff has failed to allege any red flags, let alone "multiple, obvious" ones, which would have put Defendants on notice that Ferro's financial statements and public statements contained errors, or that would have given them reason to question the veracity of same.  *See PR Diamonds, Inc.*, 364 F.3d at 685 ("Courts typically look for multiple, obvious red flags before drawing an inference that a defendant acted intentionally or recklessly."); *see also Comshare*, 183 F.3d at 553 (noting that the failure to follow GAAP by itself is insufficient to state a claim under the PSLRA and finding that the plaintiffs did not allege any specific red flags that should have put the defendants on notice of the errors).  Heavy-handed management and tough sales quotas plus accounting irregularities does not automatically require a finding of scienter.

Lastly, Plaintiff makes two additional arguments that merit comment.  First, the Court disagrees with Plaintiff that the amount of the Restatement is an "in your face" amount that "cries out" scienter.  Rather, the amount of the Restatement cannot properly be considered because the Sixth Circuit has explicitly declined to follow those courts that have held that the amount of a restatement can support an inference of knowledge or recklessness.  *Fidel*, 392 F.3d at 231.  According to the circuit, allowing the inference of fraud from the magnitude of accounting errors would eviscerate the principle that accounting errors alone cannot support a finding of scienter. *Id.* (quotation omitted).  Furthermore, to infer scienter from the magnitude of the errors would require hindsight, speculation, and conjecture.  *Id.* (citation omitted).  Second, the Court disagrees with Plaintiff that Defendants' alleged focus on a particular area of the company in which the accounting errors took place supports an inference of scienter.  As Defendants aptly note, Plaintiff offers no support for its unpled allegation that the Polymer

32

Additives division was a "key area of focus" for Defendants and investors.  Furthermore, as Defendants point out, the Sixth Circuit rejected this theory as evidence of scienter.  *Stambaugh v. Corrpro Co., Inc.*, 116 Fed. Appx. 592, 597 (6th Cir. 2004) (declining to find a strong inference of scienter where, among other things, the plaintiff referenced the magnitude of the errors and the fact that the errors involved a "material component" of the defendant's business).

### 5.     Defendants' Compensation Packages Do Not Support an Inference of Scienter

According to Plaintiff, Defendants' compensation packages support an inference of scienter when viewed in totality with the other scienter allegations.  As the Court has previously discussed, however, Plaintiff's "other" scienter allegations are not well-taken.  Furthermore, Plaintiff has again pleaded no specific facts regarding Defendants' compensation packages and makes reference to the bare numbers with the hope that the mere fact that Defendants received compensation will be enough for the Court to make a finding of scienter.  *See In re Cardinal Health*, 426 F.Supp.2d at 437 (noting that the plaintiffs did not rest on bare allegations of motive and opportunity because they presented "*specific facts* tying the Individual Defendants' compensation packages to company performance . . . .") (emphasis added).

### B.     The Allegedly False and Misleading Statements Are Not Actionable

Although Plaintiff has not adequately pleaded scienter, the allegedly false and misleading statements are not actionable.  According to Defendants, the SAC fails to plead fraud with the required particularity because Plaintiff does not support each alleged misrepresentation with particularized allegations that explain why the statement was false and misleading.  Rather, as

33

Defendants argue, Plaintiff impermissibly groups numerous statements over several pages, which encompass several different topic areas and then claims that the statements are materially false and misleading based on a single laundry list of supposed omissions that Plaintiff repeats several times throughout the SAC.  In support of its position, Defendants cite to *In re: The Goodyear Tire & Rubber Co. Securities Litig.*, 436 F.Supp.2d 873, 904 (N.D. Ohio 2006) where this Court found that the plaintiff could not evade the requirement to plead securities fraud on a statement-by-statement basis by requiring the court to match the statements with the allegations of wrongdoing.  Defendants also cite to *Havenick v. Network Express, Inc.*, 981 F.Supp 480, 524-26 (E.D. Mich.1997), in which the court found that the plaintiffs failed to plead fraud with particularity because the plaintiffs neither specified each allegedly false statement, nor gave a reason why the statement was false.  According to the *Havenick* court, the plaintiffs "simply compiled a long list of block quotes – many of which could not be regarded as false or misleading – and lined them up against what the court deemed a conclusory list of omissions.  *Id.* at 526.  Furthermore, the court found that the plaintiffs' pleading fell short of the PSLRA's guidelines because they did not "draw a specific nexus" between the allegedly fraudulent statements and the facts upon which the allegation of fraud was dependent.  *Id.*  The court also found that the plaintiffs failed to provide a clear statement of "why and how" a particular statement was fraudulent.  *Id.*  By way of comparison, Defendants argue that the SAC in this case is "strikingly similar" to the complaint in *Havenick*.

Plaintiff, on the other hand, distinguishes *Goodyear* by pointing out that the amended complaint in *Goodyear* merely listed certain alleged improprieties that may or may not have had anything do with the allegedly false statements.  Plaintiff also argues that Defendants' are

34

attempting to elevate form over substance.  According to Plaintiff, it directly linked the descriptions regarding why the statements were false to the false financial results and false statements.  Therefore, Plaintiff argues, it has adequately pleaded how and why Defendants' statements were false.  Furthermore, Plaintiff argues that to dismiss the SAC merely on the basis of form would be to use the PSLRA as a "choke point" for its meritorious claims.  The Court, however, again agrees with Defendants and finds that Plaintiff's claims do not withstand dismissal.

Here, the SAC fails to conform to the PSLRA's mandates because Plaintiff merely repeats (almost verbatim) the same list of reasons after each separate series of purportedly false statements.  Thus, the SAC is similar to the complaint in *Goodyear* because Plaintiff leaves it up to the Court to match the allegedly false statement(s) with the reason(s) why the statement is false.  Clearly, some of the statements were false – that Ferro issued a restatement is evidence that the company made prior false statements.  *See generally FirstEnergy*, 316 F.Supp.2d at 595 (citations omitted) ("By definition, then, a restatement says that the prior financial statement was false").  The PSLRA, however, requires that a plaintiff specify each statement that is allegedly false and give a *particular reason* why that statement is false.   A cursory review of the SAC demonstrates that Plaintiff does not specify each statement that is allegedly false or give a particular reason why the statement is false.  Rather, Plaintiff has simply compiled several series of statements (each of which contains multiple statements and long block quotes) and then pairs each series of statements up against what is essentially the same conclusory list of omissions.

As previously stated, the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an

35

allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity the facts on which the belief is formed."  14 U.S.C. § 78u-4(b)(1). To survive a motion to dismiss under the PSLRA, a plaintiff must "provide a particular factual basis for [the] belief that a particular statement or omission is false or misleading . . . . [The law] requires a plaintiff to draw a *specific nexus* between the allegedly fraudulent statements and the facts upon which the allegation of fraud is dependent, or, at least, a clear statement of why and how the plaintiff has reached the conclusion that a particular statement is fraudulent."  *Havenick,* 981 F.Supp at 526 (emphasis added).

Plaintiff urges the Court find that it has met the falsity standard – that it has specified the "who, what, when, where, and how" of the allegedly fraudulent scheme.  Furthermore, Plaintiff urges the Court to deny Defendants' motion because it believes that it has adequately pleaded the "substance of why" the statements were false when made.  The Court, however, disagrees because the "substance of why" amounts to little more than a repetitive series of vague, redundant, and conclusory allegations.  Accordingly, the Court finds that Plaintiff has not met its burden under the PSLRA of establishing that the challenged statements were false or misleading because the SAC lacks the requisite particularity as a matter of law.   Furthermore, the Court also agrees with Defendants that several of the allegedly false and misleading statements in the SAC are forward-looking statements that pertain to expectations regarding Ferro's future plans and objectives.  (SAC ¶¶ 66, 74, 79).  These statements, as Defendants point out in their Motion to Dismiss, were accompanied by meaningful cautionary language and are not actionable because Plaintiff  does not demonstrate that Defendants and Ortino had knowledge of actual falsity.  *See generally Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 680 (6th Cir. 2003) (noting that

forward-looking statements are actionable only if made with actual knowledge of their falsity).

Although Plaintiff argues in its Opposition that the statements are not protected by the PSLRA's

safe-harbor position because the warnings were insufficient "boilerplate" warnings, it has not

persuaded the Court that this is the case. Accordingly, the forward-looking statements are not

actionable.

**C.      Plaintiff's Section 20(a) Claim Is Dismissed As A Matter Of Law**

Control person liability under Section 20(a) is contingent upon the plaintiff's ability to

prove a primary violation under Section 10(b). *PR Diamonds, Inc.*, 364 F.3d at 696. Because

Plaintiff has not established a primary violation under Section 10(b), the Section 20(a) claim is

hereby dismissed as well.

## V.  Conclusion

Plaintiff has failed to plead fraud and scienter with the particularity required by both Rule

9(b) and the PSLRA. The Court, therefore, DISMISSES Plaintiff's claims under Section 10(b)

and Rule 10b-5 against Ferro and the Individual Defendants. Furthermore, Plaintiff's request for

leave to amend, which was made in the conclusion paragraph of their opposition, is DENIED.

*Id.* at 698-700 (noting that the plaintiffs, who failed to file a proper motion for leave to amend,

were not entitled to an advisory opinion on the complaint and then an opportunity to cure the

deficiencies).


IT IS SO ORDERED.

| | |
|---|---|
| __June 11, 2007__ | __s/John R. Adams__ |
| Date | John R. Adams |
| | U.S. District Judge |